Ebonie Batson v. The Salvation Army Good morning, Your Honors, and may it please the Court. My name is Cheryl Legree, and with my co-counsel Brian Sutherland, we represent the plaintiff, Ebonie Batson, in this matter against the Salvation Army. We're here today, and our appeal, obviously, summary judgment was granted in full to the Salvation Army in this case, and we believe that the District Court erred in granting summary judgment to the defendant here. I think Ms. Batson had several claims, ADA discrimination and retaliation and FMLA interference and retaliation. In March 2013, Plaintiff Ebonie Batson's supervisor, Major Everett Wilson, made the comment that everyone has to work in this department. We can't have sick people. That comment came within a couple of weeks of Major Wilson deciding to eliminate Ms. Batson's claim within a few weeks of a February 26, 2013, official ADA request for accommodation for Ms. Batson's multiple sclerosis and the grant on March 11 of intermittent FMLA leave to Ms. Batson. We are not suggesting for a minute that that is direct evidence of discrimination. However, we think that it does show the intent here with all of Ms. Batson's claims. Ms. Batson was a former employee of the Salvation Army and had good performance reviews throughout her employment with the Salvation Army. In November 2012, Major Wilson took over the territory in which Ms. Batson was an audit manager. Ms. Batson, with a new supervisor, asked to have a meeting to discuss the accommodations that she needed for her multiple sclerosis, and the accommodations really were pretty minor in the grand scheme of things. Her job was a heavy travel job. She traveled every week. What she needed as an accommodation and what she got as an accommodation until she officially requested it was that she was allowed to alter her travel plans on one way or the other to accommodate her doctor's appointments and also the fatigue she suffered as a result of her multiple sclerosis. Her doctor also, in the official accommodation request on February 26, suggested that she may need to work from home from time to time, and that's something that the Salvation Army allowed. In January of 2013, Ms. Batson applied for FMLA leave, and everyone, by the way, knew that she was applying for FMLA leave. Major Wilson, Mr. Durasheher, other supervisor, Regina Davis from Human Resources all knew that she was applying for FMLA leave at this time. Let me interrupt you just for a second. I just want to make sure it's clear. Was Ms. No, Your Honor. Okay. So when you said that she was, that was previous to that point? She was accommodated until she officially requested the accommodation. She officially requested the accommodation because after Major Wilson took over, she felt like she was being treated differently because she had to alter her travel schedules, was essentially what it boiled down to. And she asked them to talk to them repeatedly, and the meetings were canceled for one reason or another. Once she was sick, once Major Wilson left early and decided, oh, we'll meet in April instead. So she went to her doctor, and she got these forms from Human Resources, by the way, when she went in to say, I'm not sure what's going on. I'm not sure why I'm having these issues with FMLA. I'm not sure why I'm having these issues with my supervisors not being willing to talk to me about my accommodations. And so she officially applied. That's the right thing to do, I would say, under the law and under any circumstances. Was there, just to make sure I understand, was there an occasion after she was refused the accommodations as a general, I guess as a general matter, where she actually tried to get the accommodations and they weren't given to her? There wasn't, Your Honor, but I think this is a really unique situation here. On March 22nd, Ms. Batson was told, your accommodations are denied. On March 29th, she went on FMLA leave and didn't return until May 27th. On June 4th, she was told her position was eliminated, and she no longer had her job with the Salvation Army. So there really wasn't any time for them to, she didn't work for a long period of time and was denied her ability to travel, or flexibility with her travel. But that's because she wasn't at work. She was on FMLA leave. Can you help me with the law in this area? If a person is told, we're not going to give you any accommodation, does the law say anything one way or the other about whether you have to then try to get an accommodation, even though you've been told as a blanket matter you're not going to get it? Not that I found, Your Honor. I mean, she was explicitly told. I believe that's direct evidence that her accommodation was denied. At that point, McDonnell Douglas doesn't apply. They have to say why they didn't give it to her. In this case, I suspect that the reason they would say they didn't give it to her is because they decided to eliminate her position in March. And with respect to the FMLA interference claim, no showing of intent is required? No showing of intent. The ADA failure to accommodate claims, FMLA interference claims are interesting in that they really don't require the type of proof of intent that other discrimination claims require. You know, it's in this circuit that if you prove that the company failed to accommodate you, the only answer then is, was it an undue burden? And they have not suggested that here. With the interference claim, it is, did it have anything to do with the FMLA leave? Salvation Army's position was eliminated for valid cause. You know, whether it was or wasn't, I think what's much more important here is that Ms. Davis was told to transfer Ms. Batson into the position. Ms. Davis then said to the Salvation Army, to the Territorial Finance Commission, no, I can't do that. We have this affirmative action plan, which by the way, was not produced in discovery. But let's assume for the sake of argument that they have one. The Territorial Finance Commission, and remember, this is sort of a paramilitary organization. These are majors and she's a civilian employee. After she said, no, we have to post the position, they said, no, we're standing by our initial directive to you, transfer Ms. Batson into this position. And it's important to note that Ms. Davis knew the FMLA was approved on March 11th, the intermittent FMLA, that the accommodations were denied on March 26th. So she knew all of this when she refused to transfer Ms. Batson into the position. I think there's an even more important issue here, which is, let's say they had to post it. They did post it. Ms. Batson was the only person who applied. Why didn't Ms. Davis transfer her into that position at that point? She was the only internal candidate. And then after Ms. Batson was interviewed by Ms. Bolt, Major Bolt, they left the position open rather than put Ms. Batson in the position. She was the only candidate. They denied it to her. They posted the position for external candidates. Frankly, I just don't understand how summary judgment was granted in this case. My client was discriminated against. She was, you know, she suffered FMLA interference and retaliation. With respect to the exhaustion of administrative remedies issue, I think we need to address that issue. What the court, what the district court said is Ms. Batson did not exhaust her administrative remedies because she didn't check the retaliation box on the form. We're not suggesting, and I think that the briefs aren't clear on this point necessarily, and there's case law in this circuit, by the way, that goes both ways on this issue. But we're not suggesting that Ms. Batson's intake questionnaire was a charge of discrimination. What we are saying is the investigator had that intake questionnaire that had the retaliation box checked, that said June 4th, that said June 28th, 2013 as dates of termination when she was doing the investigation. So your argument is that we can look to the questionnaire as clarifying? It's clarifying. It's simply a clarification. And on the face of the charge, what Ms. Batson said, and by the way, Ms. Batson didn't draft it, the investigator did, said, I requested an accommodation in February 2013. My last position with the Salvation Army was audit manager. The accommodation was denied. I wasn't told why the accommodation was denied. I believe I have been discriminated against based on my disability under the ADA. So I don't know how you say under the facts of this case that her disability claim was not exhausted. So then the question is the retaliation claim. The box wasn't checked. Under the law, asking for an accommodation is protected activity. The date on the charge said June 4th, 2013 as the last date of adverse action. That was when she was told, your position's gone on June 4th. She engaged in protected conduct. She was denied the accommodation and she was let go. We believe that on its face, under Gregory versus the Department of Human Resources, a case from this circuit, that's enough to bring the retaliation claim in. In that case, the plaintiff in that case checked the sex box on her claim, did not check the retaliation box. The charge was filed after she was terminated and the court said, that's enough. Your retaliation claim is encompassed in your charge. So we believe that's binding here on this case and that the district court should be reversed on that case. With respect to the pretext issues relating to the retaliation claims, where an employee fails to follow policy, and there's two policies at issue here, right? Let's assume for the sake of argument that, oh, I see my time's up. Thank you, Your Honors. Thank you, counsel. May it please the court, good morning. Evan Ponce on behalf of the Salvation Army. If I may, let me start where my opposing counsel was sort of finishing on the administrative remedies issue. Just to briefly say, this is not a box checking case. There is a litany in her briefs of box checking cases. If the only argument here was, well, they didn't check the box, I'd agree with her. But it's so much more than that. She recounted the charge itself. It says, I wasn't accommodated. They failed to accommodate me. That's disability discrimination, period. The only reference to anything beyond that is the June 4th date over in a different box, which wasn't an argument made until the appeal for this court. So there's a problem with that to begin with. But even if this court will honor that argument and consider it, there is nothing about the charge that gives any significance to the June 4th date. And she wasn't terminated on June 4th, despite her contentions throughout. The record is very clear. Ms. Batson came back from FMLA leave on May 28th. She was reinstated to her job. She worked. On June 4th, she was told her job was being eliminated. There was a posting for a job she had done before, which she could apply for, or she could find another job. If she didn't find another job in a period of time, at that point, she would be terminated. She applied for the job. She didn't receive it. She didn't apply for any other positions or find another job. She was terminated. All that happened in June. In July, she filled out an intake questionnaire. After filling out the intake questionnaire, she filled out a charge. Well, the EEOC filled it out, and she signed it under penalty of perjury. She didn't say, this charge is missing all these things. She didn't file an amended charge. She didn't make any effort to point to any other cause of action under the ADA except for a failure to accommodate. It's exactly what the district court found. It's exactly what the law finds. All the cases, whether dealing with the checkbox or related issues, are cases where there was something in the substance of the charge. That's the Gregory case. You've got to look at the narrative, it says. Look at the narrative. There's nothing there except failure to accommodate. On that point, Judge, you asked about the failure to accommodate. There is no law that says, saying you're not going to accommodate, but never taking any action violates the law. That's what we have here. Ms. Batson managed her schedule. She telecommuted. She came early. She came late to audit. She scheduled her appointments. She did all these things. She decided she was worried about those continuing, but they never stopped. They never changed. There was never an instance in the record. And to the contrary, when she was asked in her deposition, did you get all the time off you wanted? Yes. Were you able to schedule your things the way you wanted to? Yes. Were you able to telecommute? Yes. The only change was for staff meetings on Friday mornings, Major Wilson wants us all here. Otherwise, you can still work from home and telecommute. And just to be clear, was that all that still true after the formal request for accommodation? Absolutely. Nothing ever changed. She was already on FMLA leave at the time of the accommodation. It was intermittent, but she was working and none of that changed. She came back to work after FMLA leave. None of that changed. The only thing that changed was in the interim, there had been an approval to eliminate the position. And on the position elimination, the record is crystal clear. This was a job created for a specific purpose because the prior major who was over the audit department was ill. He needed more help. That major regrettably had passed away. He had been replaced by someone who said, I've now got three administrative heads in my small department. Me, Mr. Durashay, Miss Batson. There were two before me until Major Broome was sick. I'm here. I'm not sick. We only need two. I don't need that position anymore. If we get to the failure to select her for the senior auditor position, can you discuss the interview questions? Those do seem a bit troubling to me. Well, they're not if you actually look at what was asked because this was a forum interview and the record and the testimony of Major Bolt was those were the same questions she asked to every candidate because she interviewed candidates after Miss Batson. She also didn't hire them even though there were no record of anything else. She was very particular. The job required at least 75% of the time travel. And these were audits in the field. And the practice, it was sort of like being a consultant. You left Monday morning, if not Sunday night. You were there all week. You came back Thursday night or Friday morning. And it was very important to her to make sure that her auditors were able to do the job to be present for the audits and especially a senior audit manager, which the was one of the lead people. So she was simply laying out the fact she was doing what lawyers like myself counsel our clients to do. Lay out the essential functions of the job and ask the employee, can you do it? There was no discussion of Miss Batson's disability. It never came up. Well, in the email that Miss Bolt sent, she says, I need to be coached on the questions I can ask. So she clearly was aware that there was an issue with respect to the illness. And there is a dispute about what she was aware of versus whether it was simply, this is the first time I'm doing this. I want to make sure I'm doing it right. But let's assume, Your Honor, that that's a reasonable inference that she was aware because Miss Batson had been on leave and they worked in the same department. There's nothing wrong with saying, tell me what I can ask and what I can ask. I think that's smart for a manager who's going into interviews. So I don't make a mistake. Let me be conscious of it. So she didn't say, you're on FMLA leave, aren't you? She didn't say, I know you have this illness or that illness, don't you? She said, this is how we, as a department, manage our doctor's appointments. We try to schedule them for Monday morning and then leave for an audit. We try to schedule them for Friday afternoon and come back early. Or if you need something else, you've got to get permission from your management to handle it in a different way. Can you comply with that process? That's not an objectionable question under the ADA. But aside from the questions, the emails go farther than that to indicate that she doesn't want to hire Miss Batson even before the interview, which would tend to show that her statement that Miss Batson wasn't hired because she was combative is pretext. Your Honor, I'd have to correct what I think is an error. The record was Miss Bolt testified, Major Bolt testified. She expected to hire Miss Batson before the interview. Well, right. But I think the emails undercut that when she says we backed ourselves up into a corner. That's an email from the Major Wilson email, you're saying? Major Wilson, unfortunately, sent an email which says she didn't have performance review problems with me. If we don't hire her, you're going to get a legal claim. Okay. Well, she says that she hoped to meet with, I guess it's Wilson she's talking to, and find out if we could appoint a different person in that position. So there's at least some suggestion that before the interview, Miss Bolt doesn't want to hire Miss Batson. At most, there is a dispute of fact over that, but there's no connection to her concerns about hiring Miss Batson that you're pointing out. And the connections that the plaintiffs are trying to make to her illness, they work together. They were coworkers for many years. It could have been about that. We don't know. That was not explored and developed on the record. On the record are clear, undisputed reasons why Major Bolt decided not to hire Miss Batson for that position. And plaintiff quarrels with them. She disagrees with them. But as the law requires, she does not take them on head-on and rebut them. They are left unrebutted. The interview was terrible. The issues with her performance that were brought up were unequivocally true. Yes, she didn't receive a negative performance review, but she had problems with these audits. She missed deadlines. She did not do an exemplary job in this role. And Major Bolt decided, based on those things, a poor interview with a very bad attitude and some performance problems, I'm not going to hire this person for that job. Well, Mr. Durashay, he has some conflicting testimony about her behavior in the interview. He says she never raised her voice, and he understood how she might be concerned with the fact that she was told she was going to get the job, and then that didn't seem to be the case. The process was less than perfect, Your Honor. I'm not going to stand up here and say this was a textbook case of perfected. But aren't those questions a fact, whether she was combative or whether that was pretext? I don't think it is, because what matters is the decision-maker's reasonable perception. The decision-maker, Major Bolt's, reasonable perception was, I was asking this person, can she comply with these procedures? Can she follow these rules? And her response was, I know federal law. I can follow federal law. That's a very odd, combative response in a job interview to a simple question of, this is how we handle these scheduling matters. Can you comply with that? Let me, I didn't have the specifics when I asked you before, so let me ask you about this specific portion of one of Ms. Bolt's emails. She says, I would like to know if there are any questions I cannot ask. I assume that if this candidate is applying, then the candidate can first do the job professionally, and there's some more, and second, is well enough to travel at least 75% of the time. Right. Which is a requirement for any person who's in the position. And that's true. That's an essential function of the job. All she's doing, Your Honor, is laying out the essential function of the job. She's saying, is this person qualified for the job? Had Ms. Batson said in her interview, Major Bolt, here's how I can meet those requirements by this accommodation or that accommodation, that would have been the Salvation Army's obligation to consider those requests of accommodation. None of that was discussed. None of that came up. Ms. Batson didn't say yes or no to the questions. She combatively said, I know my rights under federal law. And that, to a hiring decision maker, said this is a leadership role within my team. This is a team concept of audits. They're under pressure to, on site at a different location, go through the books and figure out if there's been fraud or malfeasance or misuse of donor funds. This is, again, this is the Salvation Army. These are donor funds. This is a charity and a church. And they like people who can work together and do this job well and efficiently. And Major Bolt made the decision that based on her reactions in the interview, she was not the best candidate, not a good candidate for the job. Now, again, Your Honor, you may disagree with that. Counsel may disagree with that. Certainly, Ms. Batson disagrees with that. But that's not the issue for the court. The issue for the court is, is that a legitimate non-discriminatory reason, which the court found it was? And did the plaintiff offer pretext? Evidence from which those reasons are unworthy of belief cannot pass the smell test. And there is no evidence. All plaintiff says is, I don't think I was combative. I didn't raise my voice. She wasn't accused of raising her voice. We don't have a situation where Major Bolt said, well, you yelled at me. And Ms. Batson said, no, I didn't. Ms. Batson says, I wasn't combative. Major Bolt says, I felt her answers were combative. And Mr. Durashay said, her tone of voice was combative. Even if she did answer the questions, her tone of voice was combative. So you've got the decision maker, Major Bolt, saying, I felt it was combative. I felt the answers were insufficient. I felt her answer, her problems in the job were sufficient enough for me not to hire her. That's her discretion, her choice. If plaintiff can rebut that with evidence that shows there was some issue here, there was some reason here that was beyond that, that's not the truth. That's a cover for something. That's not worthy of belief. And the plaintiff says the concerns about her medical condition were being covered by this combative idea. Some of those concerns were expressed prior to the interview, contrary to Ms. Bolt's statement that she was prepared to hire the candidate until the interview. I think those emails are simply a question of, I'm aware of something. How do I handle this properly? I'm expecting to hire her, so I assume if she's here, she can meet the essential functions of the job. That's what would be expected of any employee, with or without accommodation. Now, Ms. Batson actually said in her briefs that she could do the job without accommodation or with accommodation. There's some confusion about that in the arguments. The court said very clearly her testimony was, and this is the undisputed testimony in the record, she said she could do her job. She had no problems doing her job. There was no accommodation declined. There was no accommodation not given to her. There's nothing she can point to that says, I couldn't do my job because of this. In some ways, Your Honor, if you accept the argument that Plaintiff's Counsel, Appellate Counsel is making, that simply saying we're not going to accommodate you is enough. She didn't do anything in reliance on that statement. She didn't change her behavior. She didn't do anything at all. Then, if an employer says, I'm going to take some negative action against you in the future, but it never occurs, then that's an actionable claim. The mere statement would be an actionable claim by their argument. That's not the law. There must be some actual adverse action, a failure, an actual failure to accommodate, a termination, a failure to promote, a failure to transfer. Something has to happen to Ms. Batson and nothing did here. What if you have a situation where the employee, and I don't know if that's the case here, a hypothetical, where an employee asks for an accommodation, is told that she can't have it, and then doesn't take any accommodation? Well, if the employee can say- Based on what she was told. I don't take an accommodation. What happened to the job? Did she continue to do the job now? If she can't do the job now without the accommodation, sure, she's failed to be accommodated. If she says, I need this. I need you to build the ramp so I can get in the office. No. Well, I tried to get in the office. I couldn't get in there. Or I quit because I knew I couldn't get in there. I didn't come to work because I couldn't get in there. There has to be an absolute inability to do the job. There has to be some actual activity where the job isn't done, or where the employee says, I can't do it. Ms. Batson's own testimony, I did my job. I always did my job. Now, according to Ms. Major Bolch, she didn't do it all that great, and her interview was not good. And those are all legitimate, non-discriminatory reasons. The failure to transfer. There's this argument about Ms. Davis, and this argument about policies. What it comes down to is this. She testified that she genuinely believed there was affirmative action policy that she must follow. And as her role in Human Resources, this is what she must do. She must post a job. She must go through the interview process. That's what she believed. There's no evidence to the contrary whatsoever of anything else. Thank you. I'm going to address that last issue first. Ms. Davis did not say that Ms. Batson had to go through the interview process. She only said that under the affirmative action policy, as she understood it, that the position needed to be posted for internal candidates and that they needed to hire the most qualified internal candidate. Well, Ms. Batson was the only person who applied. She'd done the job for 11 years with good performance reviews. Why she wasn't transferred into that position when no one else applied, it's unfathomable here. Unfathomable. It can only have to do with the fact that she needed the accommodation, which Ms. Davis had already told her was going to be denied. And it's because she was using FMLA leave. With respect to the opposing counsel really seeks a hyper-technical argument with respect to the exhaustion requirement. It's not what the law requires. And if you look at the district court's opinion, the district court did address the issue about what is in the charge. Can it be expanded enough for the EEOC to have investigated what happened here? On June 4th, Ms. Batson was told, we've eliminated your position. You no longer have it. You can apply for new positions. That's on the face of the charge. And she said they failed to accommodate her and she believed it was because of her disability. I want to talk about Major Bolt. I think it's really important to note she didn't want to hire Ms. Batson. She didn't want FMLA leave and there's evidence in the record that she did. And she sends this email saying, is she well enough to travel 75% of the time? If that's not proof of her animus here, I don't know what is. And I think that's proof of pretext in this case. Ms. Bolt didn't want Ms. Batson because she knew Ms. Batson needed accommodations and would need leave under the FMLA. Here, summary judgment should have been denied and this case should have gone to a jury trial for the issues. Thank you, Your Honors. Thank you, counsel. We'll be in recess. Well done. Thank you. I guess, cause she has that, as you kind of identified, a difficult personality. And it is unusual. There's no way around the fact that when other officers say, do this, she said it's, no. Not a normal reaction. It's the first time she's ever done that. Oh, yeah. We can argue about what her reaction was, but in my opinion, I know her pretty well, because if she believes something was right or wrong. Okay, but why didn't she get her into the position when she was the one that applied? And you know, it's a good question. My guess is, and obviously if you look at the trial, we'll find out in good time. Oh, there's one right there, sir. Well, I know that's your position. My guess is that what she said was correct, but I haven't really answered that question. Because I know, until the appeal, I never really thought about that part of it. I sort of looked at the transfer of hiring as one big thing. And I think what you've identified are sort of two moments. There's the, why did she transfer when you know the candidates? Why did she force her to go to the interview? I think what Pugini would say is, that's what I thought I was supposed to do. Just like I was supposed to post the position. But she never put that in writing. And that may not be. I think that's more of, my guess is she never really thought through that it was just when you post the position in the interview, it's the classic, I'm an HR person in a little HR box, and I only know my HR box, and I don't step out of the world. There are lots of HR people who are not like that, that are really good and really thoughtful in the interview picture. That's what she needs you for. Well, we're here because of it, and they paid a lot of money because of it. There's no question. I mean, look, I'd say, I haven't found anything that's really valuable to me. Now, I don't know what would have happened down the road, if not all of this would have gone on now. She's done a good job of seeing the other. I don't think it would have been fine. If she didn't do a good job of seeing the other, there wouldn't be a problem with the entire thing. I think it would have been fine, and I think she still would have been there. But, yeah, so, I mean, she's a great person. Well, I mean, when you ask three or four times, someone who has been out on medical leave, can you do it? She's hypersensitive, and that's something that many people certainly didn't understand how hypersensitive is. So, it's something that comes back to the folks, like, from even little things, like, you know, when she came back to work on a date, she thought she was supposed to come back, and she was definitely confused about that, and it was a lot more of a, I should get back to her job, or even get her computer box out of there, but then she's pissed. So, Rendrick Nash sent her out again. Is she still there? You know, it was a cluster. That was a cluster. Somebody comes back to work, and you're not ready for them to go, and you send them back to Apple, and you get inside, and she's upset. You know what I mean? But she thought she was going to come back. Well. Because both had a paradigm going with that. And it was, I think I remember, like, you should take a long time to get back. Yes. And then there'd be, like, three or four, three or four calls. I think that's one of those situations where if you were, if you were in a department, and you're all of a sudden head of the department, you've got years of, when I'm in charge, I'm going to do it this way. And that's when we form the perfect family, which there is no such thing. Yeah. But. You guys run it right? I can see it right in your eyes over there. Yeah, you know, it's. It's good. You're good. You're fine. Well, I get ready for the next one. Oh, yeah. Is it tomorrow? You stay. No, no. That's it. We're done for the day. Marshall's downstairs. Also, yes. Yes, sir. Everybody had sort of the same reaction. This is already in the airport. I'm like, well, that's right. You know, maybe it's a good thing. If I was a judge. Yeah. My my name is public information. My work address is public information. Yeah. I'm dealing with all kinds of people who have all kinds of very serious concerns. Presumably. And there's no such industry. I can only imagine that these are seven male on the turn to nothing or nothing for either threats and get the regular, let alone the actual instances. So I've been in courthouses, especially by the courthouses. You know, witnesses or clients are always. So. I don't want you to mess around. It's sort of a secret service. It's very much the same goal. You have one mission. That's what these judges say. And you're going to do it. So and if anything doesn't fit 100 percent, it can happen. And, you know, they, you know, they they make sure that we follow the same procedures. And a lot of times they're the ones that kind of stress. Especially, you know, essentially. I was I was curious about this morning because I hadn't been for five years. And, you know, in that time, the district court's got much more to go about. Right. Lawyers. That's right. And so I pulled in this morning. I saw a lot of things change at the 11th Circuit. Yeah, because, you know, as you know. Yeah, there was a delay. Yeah. But that's the cards. Yeah. Good. Yeah. Go ahead, this one, six, five. Yes, judges are conference. Careful, we'll do it. We'll advise. Yeah. You know, it's it's sort of a dreadful part of it. So you. Well, I don't want to use two because. You know, they build that new. Right. Careful. They built that new space for the security so that you're outside the physical. But most of us still come into the coach. That's right. So you're already in the building. Yeah. Which is to me, that's concerning. Yeah. If I were there, I mean, it's funny. I would build a little something outside of that. I don't know. She's mine. She knows. Yeah. You know, didn't exist. They don't know that that, you know, kind of fishbowl that would come in. Because they had to try to build it to accommodate in this facility in the way it is. So they pretty much need to go out into the street. You got to know. Right. And I was wondering, too, when I parked, if it was going to be insurance, because, again, it did five years and I didn't know if they had on a different side, had room out or whatever. I'll let you know. It's nice to see you here, sir. You can have a great concert radio. Yeah. Ten four. Yeah, it's amazing. It's always so good to hear you. I can only imagine trying to relax for a bit, you know. Sorry about that. All right. Thank you. All right. Thank you. Hey, Tony. We dropped the key years home, supposedly back here. I don't I don't say this is called. It was a key, you know, one of our key cell phones. But you know, people say, well, I got to go upstairs. Well, I'm going to. Or they'll say, uh, you know, call you. We have like a man. And you'll call us and go up. Listen, I got home. I got back in my office and sure enough, it's in my purse. It's in the wall or, you know, my sport coat or my jacket. And then. Okay, thanks.